37 F.3d 1505
NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 Donald W. MORSE, Petitioner,
v.
FEDERAL AVIATION ADMINISTRATION, Respondent.
 No. 93-70264.
 United States Court of Appeals, Ninth Circuit.
 Submitted June 8, 1994.*
Decided Sept. 28, 1994.
 
 Before: POOLE, BRUNETTI and KLEINFELD, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 We reverse the NTSB determination that Morse materially falsified his logbook, but affirm on the remaining issues. We remand so that his sanction can be reconsidered on the basis of the other violations but not the logbook falsification.
 
 
 3
 We cannot find substantial evidence on the whole record, Tur v. FAA, 4 F.3d 766, 770 (9th Cir.1993), for the materiality element of the false logbook entry charge.
 
 
 4
 It could not mislead the pilot into thinking Morse had obtained a permit to fly over the United Kingdom for two reasons. First, when Morse faxed the logbook page, he also faxed the face of his ferry permit, which said that it was from "BGR, US AIRSPACE." That meant Bangor, Maine. Second, he had asked the pilot, recommended by the insurer, what paperwork was needed to fly the plane in the United Kingdom, and the pilot had told him that he did not think anything was needed because the plane was registered in the United States, not the United Kingdom.
 
 
 5
 It could not mislead the FAA. The record contains no evidence of any way in which the FAA might do something or not do something on the basis of this logbook entry. The FAA knew what it had issued--a permit from Bangor, Maine, the first place which the plane would reach in the United States, to Deer Park, Washington. That is what the permit said.
 
 
 6
 The obvious and likely victim of the falsification would be British air authorities. A copy of the British regulation was put into the record as an exhibit. It said
 
 
 7
 An aircraft shall not fly unless there is in force in respect thereof a certificate of airworthiness duly issued or rendered valid under the law of the country in which the aircraft is registered, and any conditions subject to which the certificate was issued or rendered valid are complied with.
 
 
 8
 The FAA has a regulation which requires that a person operating an aircraft of U.S. registry outside the United States shall "[w]hen within a foreign country, comply with the regulations relating to the flight and maneuver of aircraft there in force." 14 C.F.R. Sec. 91.703(a)(2). The back side of the ferry permit, which Morse did not fax to his pilot, said "[n]o person may operate the aircraft ... over any foreign country without the special permission of that country."
 
 
 9
 One would think that the British would not want an airplane flying over their land without reasonable assurance that it would not fall out of the sky into a populated area. The regulations quoted are designed to accomplish that purpose.
 
 
 10
 The problem we have is the same one that the NTSB had--a lack of proof which we suppose probably could have been provided, but was not. The NTSB decision says that
 
 
 11
 the Administrator did not prove a violation of section 91.703(a)(2); that is, operation in a foreign country of a U.S. aircraft that did not comply with the foreign country's regulations. While British law undoubtedly proscribes the operation of unairworthy aircraft in United Kingdom airspace, wherever they might be registered, the Administrator had the burden of establishing what U.K. law required in the circumstances by showing that civil aircraft N95J did not have a current and effective U.S. airworthiness certificate and that the ferry permit that the respondent had obtained was not valid in U.K. airspace. That burden was not met.
 
 
 12
 (E.A.R. J at 9)
 
 
 13
 The NTSB had reasonable evidence on the whole record to support this determination. We think its implications went one step further than the NTSB took it. We cannot reconcile this determination with the proposition that materiality of the false logbook entry was proved.
 
 
 14
 If it could be said that Morse had a ferry permit, but not an airworthiness certificate, from the United States, then the British law would appear to be violated, which would imply a violation of American law. But we cannot draw that distinction on this record. The thing we have been calling a ferry permit is a printed card which does not call itself a "ferry permit." It says in boldface print at the top, "SPECIAL AIRWORTHINESS CERTIFICATE." (A.R. 949). Evidently, a ferry permit is a species of airworthiness certificate, not a different thing from an airworthiness certificate.
 
 
 15
 To the extent British law was proved, it was in Morse's favor. He asked several people who should have known what he had to do to comply with British law, his pilot, the manager of the facility from which he bought the airplane, and another certified British mechanic. They all told him he did not have to do anything. His logbook entry did not falsely say that he had a permit to fly over British airspace, and none of them relied on his false statement in the logbook for their opinions. They expressed their opinions before he wrote the false logbook entry. In any event, the false part of the entry just said he had a permit to fly over the ocean. It said "from UK," not "from Biggin Hill."
 
 
 16
 The NTSB decision bases materiality on the proposition that the false entry "could have misled others, such as the aviation authorities in countries along the planned route of flight from the U.K. to the U.S. (Greenland, Newfoundland and Canada), into believing that whatever permission that might have been necessary to make the complete flight had been obtained." This sounds likely to be true. The anticipated 24 hours of flight time under visual flight rules would require that the plane land somewhere between the United Kingdom and the United States. Avoidance of paperwork with Danish and Canadian authorities would explain why Morse might have made the false entry. But we have the same problem with lack of evidence in the record. The record did not establish that Greenland and Canada, any more than the U.K., had laws which would be violated by the flight.
 
 
 17
 It is a pretty good guess that the false entry was material, but a guess is not enough. The failure of proof correctly identified by the NTSB requires us to grant the petition in part, with respect to the false logbook entry, because materiality was an element of the FAA's case, and was not proved. Janka v. Department of Transp., National Transp. Safety Bd., 925 F.2d 1147, 1150 (9th Cir.1991).
 
 
 18
 We reject Morse's remaining contentions, to the extent that they are not obviated by our reversal of the false logbook entry holding.
 
 
 19
 He sufficiently "operated" the aircraft, for purposes of 14 C.F.R. Sec. 1.1, because he caused his pilot to fly it. Morse testified that he told the pilot to "call me, touch base with me, make sure you've got everything you need to fly that airplane." This, together with his other testimony, was enough to establish, in the absence of proof to the contrary, that he relied on the pilot to get whatever permits were needed in England. But the pilot did not make so great a deviation from his instructions that the NTSB would have to say Morse was no longer responsible for the flight.
 
 
 20
 The pilot's deviation was more like when a bus driver is told not to exceed the speed limit, and then has an accident while going 15 m.p.h. over the limit, than like telling the driver not to operate the bus, and he operates it anyway. Not every deviation of an employee from his instructions will eliminate his employer's responsibility. See generally Restatement (Second) of Agency Secs. 228, 229, 230, 232 (1958).
 
 
 21
 We reject the procedural due process objection because Morse had fair notice of the charge. The charging document said that Morse used a duplicate "pink slip" copy of the registration outside the United States without special permission. It just failed to cite the regulation, 14 C.F.R. Sec. 91.203(a). Paragraphs 21 and 22 of the complaint allege:
 
 
 22
 21. At the time you authorized the operation of civil aircraft N95J ... you had been issued the second duplicate (pink) copy of the Aircraft Registration Application and had not yet been issued a Certificate of Registration for civil aircraft N95J.
 
 
 23
 22. By reason of the facts and circumstances stated in paragraph 21 above, you authorized the operation of civil aircraft N95J on a flight outside the United States when you only had been issued the "pink" copy registration application.
 
 
 24
 (E.A.R. A at 4)
 
 
 25
 This was enough to put Morse on notice that the FAA would try to prove these allegations at the hearing. United States v. Vroman, 975 F.2d 669, 671 (9th Cir.1992). In fact, Morse submitted a motion in limine at the commencement of the hearing requesting that the allegations in these paragraphs be stricken from the complaint.
 
 
 26
 Nor was the complaint stale, even though the violations were more than six months old. The six month rule has an exception if the complaint alleges that the certificate holder is unqualified. 49 C.F.R. Sec. 821.33(b). This complaint fell into the exception.
 
 
 27
 Morse's challenge to the FAA's authority to use its emergency procedure is moot. The emergency procedure lets the FAA take the permit first, and prove its case afterward. Now that the proof has been presented, the order no longer matters.
 
 
 28
 We remand so that the NTSB and FAA can reconsider the penalty on the basis of the other charges, but not the false logbook entry.
 
 
 29
 AFFIRMED in part, REVERSED in part, and REMANDED.
 
 
 
 *
 The panel unanimously finds this case suitable for decision without oral argument. Fed.R.App.P. 34(a); 9th Cir.R. 34-4
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3